UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


Kyle Guay

    v.

Sig Sauer, Inc.

Civil No. 20-cv-736-LM
Opinion No. 2022 DNH 082 P


**O R D E R**

Plaintiff Kyle Guay brings this products liability case against Sig Sauer, Inc. Guay alleges that his Sig Sauer P320 pistol fired a bullet without a trigger pull when he was attempting to remove the gun from its holster. The bullet struck Guay in the leg.

Sig Sauer moves to exclude Guay's expert witnesses, Peter Villani and Timothy Hicks, both of whom opine about the mechanics of the P320 pistol and its alleged defects. Doc. nos. 26, 27. Contingent on excluding Villani and Hicks, Sig Sauer moves for summary judgment on the ground that Guay cannot carry his burden to prove Sig Sauer sold the gun in an unreasonably dangerous condition. Doc. no. 28. Sig Sauer also argues that Guay cannot show causation. Guay objects.

For the following reasons, the court denies Sig Sauer's motion to exclude Villani (doc. no. 26) in part and grants it in part. The court denies Sig Sauer's motion to exclude Hicks (doc. no. 27), and the court denies Sig Sauer's motion for summary judgment (doc. no. 28).

# STANDARD OF REVIEW

Federal Rule of Evidence 702 provides the requirements for expert witness testimony:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a)    the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b)    the testimony is based on sufficient facts or data;
>
> (c)    the testimony is the product of reliable principles and methods; and
>
> (d)    the expert has reliably applied the principles and methods to the facts of the case.

Based on those requirements, an expert witness's testimony may be challenged on the grounds that the witness is not qualified to give the opinion, the opinion is not based on specialized knowledge, the opinion is not reliable, or the opinion is not relevant.  Carrozza v. CVS Pharm., Inc., 992 F.3d 44, 56 (1st Cir. 2021); Bogosian v. Mercedes-Benz of N. Am., 104 F.3d 472, 476 (1st Cir. 1997).  The proponent of the expert witness bears the burden of showing that the testimony is admissible.  See Martínez v. United States, 33 F.4th 20, 24 (1st Cir. 2022).

The judge has a gatekeeping role to ensure that an expert witness's testimony is both reliable and relevant.  Id.  In carrying out that function, the judge focuses on the process that generated the opinion, not on the opinion itself.  López-Ramírez v. Toledo-González, 32 F.4th 87, 94 (1st Cir. 2022) (citing Daubert v.

*Merrell Dow Pharms., Inc.,* 509 U.S. 579, 595 (1993)). "There is an important difference between what is unreliable support and what a trier of fact may conclude is insufficient support for an expert's conclusion." *Milward v. Acuity Specialty Prods. Grp., Inc.,* 639 F.3d 11, 15 (1st Cir. 2011); *López-Ramírez, 32 F.4th at 94.* "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert, 509 U.S.at 596.*

## BACKGROUND

On the evening of January 28, 2020, Guay was wearing his Sig Sauer P320 gun in a Sig Sauer holster on the right side of his belt while walking his dogs. After the walk, Guay started to remove the holstered gun by pushing down on his belt and pulling up on the holstered gun. The gun fired, and a bullet shot through Guay's right thigh. Guay asserts that he did not pull the gun's trigger. Rather, Guay contends that the gun fired because a defect in its design or manufacture allows it to fire when it is jostled under certain conditions.

## DISCUSSION

Sig Sauer moves to exclude the opinions of Guay's two proposed expert witnesses: Peter Villani and Timothy Hicks. Sig Sauer contends that they are unqualified to render expert opinions and that their opinions are unreliable. Sig Sauer also moves for summary judgment, premised primarily on the exclusion of Guay's expert witnesses. Guay objects to excluding his experts, arguing that they

3

are qualified and that their conclusions rest on reliable foundations. Guay likewise opposes summary judgment. After the motions at issue were fully briefed, the court held a hearing during which both Villani and Hicks testified and were subjected to cross-examination by Sig Sauer.

I.      Motion to Exclude Opinions of Peter Villani

Villani provided an expert report and a supplemental report in which he identifies design and manufacturing defects in Guay's P320 and other "exemplar" P320s. In his report, Villani concludes that those defects could cause the guns to fire without a trigger pull. Sig Sauer moves to exclude Villani's opinions on the grounds that he is not qualified to give the opinions in his report and that his opinions are not reliable.

A.      Villani's Reports

1.      Experience

In his curriculum vitae, Villani states that from 2001 to the present he has worked for the United States Department of Veterans Affairs Police as a primary evidence custodian, senior firearms instructor/armorer, and operations officer with the rank of Major. Villani's duties include detailed examination of the guns used in the department and cleaning the guns once a year. During the Daubert hearing, Villani testified that he also investigated an incident in which a police officer who worked for him was shot after his P320 discharged without a trigger pull.

4

From 1995 to 1999, Villani managed a shooting range. In that position Villani had a variety of duties, including cleaning and repair of customers' guns and holding gun safety classes. In that role, Villani also evaluated personal gun collections for consignment sales. Finally, Villani has been certified by Sig Sauer as an "armorer" for several gun models, including the P320. The P320 armorer's course, which was taught by a Sig Sauer employee, required Villani to learn the P320's components in detail and pass a written examination about the P320's components.

2.    Opinion

For purposes of his first report, Villani examined two "exemplar" P320s and two P320s "in evidence. The two "in evidence" P320s that Villani examined were Guay's gun, which was involved in the incident that is the subject of this case, and a P320 involved in a different incident that is not the subject of this case (the "Schneider P320"). Villani test fired the two "exemplar" guns. He did not test fire the Schneider P320 or Guay's P320.

In his report, Villani reviews what he observed when he examined each gun. He notes the condition of various internal components and other features particular to each gun. Villani explains how he inspected their interior components for wear, alignment, cleanliness, and function; took measurements; and compared components and conditions. Villani also recorded a variety of design and manufacturing defects for each gun.

5

In particular, Villani observed that some internal components had wear or rounding of their edges, which he described as "rollover." Villani opines that this wear results from insufficient contact between internal parts. In essence, the parts' surfaces are rough and have excess material on them. Villani opines that the rough surfaces result from the P320's manufacturing process, that is, the parts are "cast" in a "mold injected metal" process rather than "machined." Villani opines that if the parts were machined then they would not wear down in the way he observed. Villani adds that machined parts are "finely finished" which provides "better contact." Doc. no. 26-4 at 3. In short, Villani believes that if the surfaces of these parts were less rough, there would be more surface area in contact between the parts and therefore a lower likelihood that they slip and allow the gun to fire without a trigger pull.

As to Guay's P320, because the gun was "in evidence," Villani's inspection was limited to a "field strip." During his inspection, Villani photographed the gun to show the defects that he found. Similar to the exemplar guns, the first defect Villani found was "rollover" on the striker foot and sear face and marks indicating that the sear and striker foot were not functioning as intended. He also found that the striker foot and striker housing had side to side movement that could cause the striker foot to land differently each time and, in his belief, cause the safety to be disengaged, allowing an unintended discharge.

6

Additionally, on March 17 and 18, 2021, four P320s that had been involved in unintended discharges, including Guay's P320, were CT[1] scanned and photographed. Villani prepared a supplemental report based on those scans and photographs. Doc. no. 26-5. As before, Villani found excessive space and movement, misalignment, and rollover in the internal components, which Villani characterizes as defects. In his supplemental report, Villani states that "[a]fter a careful review of the discovered design and manufacturing defects within all of the Sig Sauer model P-320 pistols that I have personally examined, I can, to a reasonable degree of technical certainty state that the four subject pistols discharged without manipulation of the triggering mechanism." Doc. no. 31-13 at 5, ¶ 21. In his deposition, Villani clarified that he also based his conclusion in part on the condition of Guay's holster and on Guay's own statements that he did not pull the gun's trigger.

B.   Villani is qualified to opine about the subject matter of his opinion.

Under Rule 702, a witness must be qualified by "knowledge, skill, experience, training, or education" to provide expert opinions. Fed. R. Evid. 702. Sig Sauer contends that Villani is not qualified to opine about the design or manufacture of the P320 because he is not an engineer and has never worked in the design or manufacturing of guns. Sig Sauer contends that the armorer's course for the P320

---

[1] A "CT" or computed tomography scan involves the use of several x-rays and computer processing to generate cross-sectional imagery. See Computed Tomography, Stedman's Medical Dictionary (2014).

7

does not include any training in gun design or manufacture. Instead, Sig Sauer states, the armorer's course only qualifies the recipient to perform basic and routine maintenance on a P320. Guay responds that Villani is qualified to give his opinions based on his certification as armorer for the P320 gun and his "vast experience with firearms." Doc. no. 31 at 2.

Villani is qualified on the basis of his experience to opine about subjects such as the proper functioning of firearms and the condition of their internal components, firearms care, and conditions that make firearms unsafe. Cf. Hammond v. Int'l Harvester Co., 691 F.2d 646, 653 (3d Cir. 1982) (finding no abuse of discretion when district court admitted expert to opine about tractor defects where expert "had worked selling automotive and mechanical equipment including agricultural equipment" and "taught automobile repair and maintenance at a high school" but did not have a degree in engineering or physics). More specifically, based on his experience maintaining and examining firearms, Villani can opine about the potential consequences of identified issues with internal components, i.e., he can opine that if Piece A and Piece B do not align correctly or do not have enough surface area between them, a possible or likely result is that the gun can fire without a trigger pull. Villani's testimony during the Daubert hearing, considered alongside the work history outlined in his curriculum vitae, demonstrate to the court that he has valuable and significant expertise in inspecting and handling firearms, including the P320. Villani's experience in this regard will be helpful to the jury in evaluating the facts of this case.

For example, Villani testified during the <u>Daubert</u> hearing that he cleans and inspects firearms as part of his current job managing the Department of Veterans Affairs police. Villani's job also involves investigating discharge incidents, including an incident when a P320 owned by an officer in the department he manages discharged without a trigger pull. Sig Sauer's own motion describes Villani as being able to "disassemble the firearms to identify worn or damaged parts that need to be replaced." Doc. no. 26-1 at 9. In his report, Villani does exactly that: he discusses the pistols that he disassembled and how he found what he perceived to be worn or damaged parts.

Considering Villani's extensive professional experience with firearms maintenance and safe operation, Villani's lack of engineering training and minimal formal higher education is not significant to the question of admissibility in this case. To be sure, the subject matter about which Villani plans to testify—the mechanical components of the P320 and guns like the P320—is beyond the knowledge the average person possesses. At the same time, the subject matter of Villani's opinion is not rocket science. In other words, Villani's lack of engineering experience is less important than it might be in another case with a more complex machine. Accordingly, neither a degree in engineering nor a lifetime designing firearms is necessary for Villani to develop sufficient practical experience to opine about how guns or gun safety devices are supposed to work. See Romero v. ITW Food Equip. Grp., LLC, 987 F. Supp. 2d 93, 102-03 (D.D.C. 2013) ("Although Defendant objects that Kane has no specialized expertise in designing commercial

9

kitchen equipment . . . Defendant does not explain why such specialized expertise is required in order to competently opine upon the safety of a basic mechanical device sold in 1967.") (citation omitted).  Indeed, courts routinely find that a person need not be a mechanical engineer or designer to opine about the design or safety features of a product they use; extensive professional experience with the product can substitute as warranted.  E.g., Kirksey v. Schindler Elevator Corp., No. 15-0115-WS-N, 2016 WL 5213928, at *4 n.6 (S.D. Ala. Sept. 21, 2016) ("Defendants' point is, apparently, that unless Cooper has personally designed escalators, he is unqualified to opine about escalator design.  Defendants offer no case law to support such a stringent construction of Rule 702's qualifications requirement.  Research reveals a wealth of well-reasoned authorities to the contrary.") (citation omitted); Hilaire v. DeWalt Indus. Tool Co., 54 F. Supp. 3d 223, 240 (E.D.N.Y. 2014) ("Having considered Mr. Barbe's qualifications, the Court finds that it is not necessary that Mr. Barbe be an electrical or mechanical engineer in order to opine on questions of the safety elements of a product's design.").

For the most part, the opinions Villani intends to offer are within his specific band of expertise.  In his report, Villani describes the condition of the pistols he disassembled and examined and the condition of their internal components, which he measured.  Taking his observations, Villani discusses why he believes those components had problems (e.g., misalignment, not enough engagement between two parts) that could lead to an unintentional discharge.  Villani is qualified to offer those opinions.

However, Villani did not identify any relevant experience about identifying the underlying cause of the defects he identified or about how they might be fixed. Villani has not disclosed any experience or training in firearms manufacturing processes or manufacturing processes generally. Accordingly, although Villani has sufficient experience to opine about what he saw and what he concluded when he conducted his examinations, as described above, he does not have sufficient experience to opine about the mold or casting process and whether a machining process would have prevented the problems he identified.

C.    Villani's opinion is sufficiently reliable to be presented to the jury.

Sig Sauer also challenges the reliability of Villani's methodology in reaching his opinions in this case. Sig Sauer contends Villani's failure to test the P320 gun and the lack of supporting studies or literature for Villani's defect theories demonstrate the unreliability of his methods. Sig Sauer contends that Villani's visual inspections of the P320 guns are insufficient to support his defect theories.

In response, Guay cites the CT scans of the subject and exemplar guns and the photos of the guns' internal surfaces as reliable bases for Villani's opinion. Guay adds that Villani relied on the other instances when people have reported that a P320 gun fired without a trigger pull as tests that the P320 gun could malfunction in that manner. Guay asserts that Sig Sauer can cross examine Villani to the extent it challenges his opinion that, given what he observed in the CT scans and guns that he disassembled, the guns can misfire because of the "rollover" condition.

11

What "reliability" means in the context of admitting expert testimony defies strict definition. See Milward, 639 F.3d at 14. Rather, the identification of what aspects of an opinion can demonstrate reliability "must come from developing case law in adjudicating individual controversies." See id. "There is an important difference . . . between what is unreliable support and what a trier of fact may conclude is insufficient support for an expert's conclusion." Martínez, 33 F.4th at 24 (quoting Milward, 639 F.3d at 22). "That the factual underpinning of an expert's opinion is weak is a matter affecting the weight and credibility of the testimony—a question to be resolved by the jury." Id. The court is a "gatekeeper" not an "armed guard," and the "party who proffers expert testimony" need not prove to the court "that the expert's assessment of the situation is correct." Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co., 161 F.3d 77, 85-86 (1st Cir. 1988).

Villani's opinion is sufficiently reliable to be considered by the jury where his experience qualifies him to testify. Although the discussion in Villani's expert reports is unpolished, he explains a logical process that led him to the conclusions on which he is qualified to testify. Specifically, Villani observed and measured the contact area between certain parts of the P320 that, given his knowledge and experience about how pistols operate, he knows are meant to stay in contact or engaged with each other until the gun's trigger is pulled. Villani observed that the edges of these parts in the P320s he analyzed are rounded. Based on his measurements and observations, and his knowledge of firearms components and their mechanics, Villani concluded the parts could slip over each other and allow the

12

gun to be fired without someone pulling its trigger. Because the opinion is supported by reliable foundations—Villani's measurements, observations, and his experience about how firearms work—it is sufficiently reliable to be admissible. See Symington v. Daisy Mfg. Co., 360 F. Supp. 2d 1027, 1031-32 (D.N.D. 2005) (admitting expert on air rifles when he did not have any engineering or gunsmithing experience but had taken armorer courses, examined thousands of firearms, and had previous experience as an expert in criminal cases. Opinion was reliable because it was based on the expert's "observation of the mechanics of the airgun," and he described "how pellets enter the gun and how this can lead to one becoming lodged in the BB feed hole. All of this information is based on observing the travel path of the ammunition.").

Sig Sauer contends that Villani's opinion should be excluded because he did not test his theories to confirm their correctness. In the First Circuit, however, whether Villani's theory is confirmed by specific testing does not necessarily make it inadmissible; rather, it makes it susceptible to cross-examination by Sig Sauer and rebuttal by Sig Sauer's own experts. See Quilez-Velar v. Ox Bodies, Inc., 823 F.3d 712, 719 (1st Cir. 2016) (stating that testing is "not an absolute pre-requisite to the admission of expert testimony"). As stated, Villani need not prove that his conclusions are in fact correct for his opinion to be considered reliable. See Ruiz-Troche, 161 F.3d at 85 ("Daubert . . . demands only that the proponent of the evidence show that the expert's conclusion has been arrived at in a scientifically sound and methodologically reliable fashion.").

At bottom, Villani's theory is based on objective, physical observations—his measurements, the CT scans of the gun, and the design of the gun—as well as determinations or assumptions about the mechanics of the gun based on his experience. The foundations for Villani's conclusions are either readily disproved (his measurements and observations) or subject to straightforward challenge by Sig Sauer's own experts (his assumptions about the mechanics based on his experience). And while Sig Sauer performed its own testing of Villani's theories in a lab, Guay contends that this testing is not useful in this case because the real-world circumstances involved in the unintended discharges of P320s cannot be safely replicated in a lab. A jury is capable of weighing the value of the parties' competing arguments.

For those foregoing reasons, Sig Sauer's motion to exclude Villani is denied in part and granted in part.

## II.     Motion to Exclude Opinions of Timothy Hicks

Sig Sauer also moves to exclude the opinions of Guay's other expert witness, Timothy Hicks, on the grounds that he is unqualified and his opinions are unreliable. Guay objects.

### A.     Hicks's Experience & Report

Hicks has a Master of Science degree in mechanical engineering. He is an engineer at Professional Analysis and Consulting, Inc., a firm that performs

technical consulting in product performance and failure analysis and prevention. The bulk of Hicks's experience is in the automotive industry where he was "responsible for the design, manufacturing, testing, and validation of vehicle systems," among other things. Doc. no. 31-11, at 2.

As a consultant engineer, Hicks has done investigation and certification tests on guns and gun safety devices under California and Massachusetts regulations. He has also done tests for incidents involving guns. He holds Certificates of Eligibility from the California Department of Justice and Massachusetts Firearms Records Bureau Executive Office of Public Safety for analyzing and certification testing of guns.

Hicks was present for the inspection of Guay's P320 and several other guns on March 18, 2021. In his report, Hicks describes the process used to inspect and examine the guns, including CT scans. He notes that tests were performed by a Sig Sauer expert under laboratory conditions.

Based on the inspection, tests, and photographs, Hicks found that Guay's gun had design and manufacturing defects that "led to the uncommanded (unintended) discharge of the firearm." Doc. no. 31-11, at 4. Hicks noted that certain parts of the P320 were molded in metal without further machining, allowing for uncontrolled variability, that the sear and striker foot had inconsistencies on their contact surfaces, including rollover, that minimized their actual contact, that those parts had misalignment, and that other parts had gaps that allowed movement which could cause misalignment.

15

B.     Hicks is qualified to opine about the subject matter of his opinion.

Sig Sauer contends that Hicks's experience with testing guns is too limited to qualify him to provide opinions about the design and manufacture of the P320 gun. In response, Guay states that Hicks is qualified as a mechanical engineer and has substantial experience with investigations into P320 guns and their function and testing in this and two other similar cases as well as experience with other guns through his testing in California.

Hicks is qualified to opine about all aspects of his opinion. Hicks is a mechanical engineer with substantial experience, and he specializes in the technicalities of product performance and failure. Accordingly, his training and experience provide a basis for expertise in the mechanical workings of a product, including a gun. See Palatka v. Savage Arms, Inc., 535 Fed. Appx. 448, 455 (6th Cir. Aug. 9, 2013) (finding that mechanical engineer who lacked specialized experience with firearms was nonetheless qualified to opine about firearms defects because "[h]is skill, education, training in mechanical engineering render him competent to offer opinions on a variety of mechanical topics . . . ."); Putman v. Savage Arms, Inc., No. 7:17-cv-168, 2019 WL 1007514, at *2 (W.D. Va. Mar. 1, 2019) (relying on Palatka and rejecting similar argument that lack of specialized experience with firearms required disqualification under Fourth Circuit law).

On top of that general training and experience, Hicks has specific training and experience with gun design and components even if the bulk of his experience is

16

in the automotive industry. Finally, as discussed above with respect to Villani, there is no indication that mechanics of guns are so specialized that a person requires a lifetime of experience specifically with guns or a particular gun to be able to opine about its design or manufacturing flaws. Sig Sauer can ably attack the weight of Hicks's opinions vis-à-vis his experience through cross examination at trial.

### C.    Hicks's opinion is sufficiently reliable to be presented to the jury.

Sig Sauer also challenges the reliability of Hicks's expert opinion. Like Villani, Sig Sauer faults Hicks's analysis because he did not test Guay's gun to see if it would fire without a trigger pull or test other P320 guns to see if the defects he claims exist in the P320 would cause those guns to fire without a trigger pull. Sig Sauer further contends that Hicks should have taken measurements and provided calculations to show that the defects he identified could cause the guns to fire without a trigger pull. In the absence of that proof, Sig Sauer contends that the only relationship between Hicks's identified defects and the gun's ability to fire without a trigger pull is Hicks's statement to that effect. Guay objects and points to Hicks's examination and description of the gun parts to support his opinion.

Sig Sauer's challenges to the reliability of Hicks's opinion do not justify exclusion. In his report, similar to Villani, Hicks explains that the variables, misalignments, and inconsistencies in the P320's parts decreased the contact between parts that keep the gun from firing unintentionally. For example, Hicks

17

states that "[w]ith the minor amount of overlap between the two components, [striker foot and sear] only a minor amount of trigger movement would allow the striker to move forward and discharge a round."  Doc. no. 31-11 at 6.  Sig Sauer characterizes this opinion "ipse dixit"—meaning an opinion rendered without any basis beyond the expert's conclusion itself—but the foundations of the opinion are the observations and measurements of the guns, including the CT scans of the guns. Because these are objective, observable characteristics of the guns, Hicks's opinion is not premised on his "ipse dixit."  And, as a mechanical engineer Hicks is qualified to explain his understanding of physics and mechanics to the jury (just as Sig Sauer's experts may likewise explain their own understanding).

Like Villani, Hicks faults the manufacturing process for the P320 for the defects and compares the relevant unmachined part of the P320 to the equivalent— but machined—part of a different gun.  Unlike Villani, however, Hicks has experience with manufacturing processes, and thus can explain to the jury the differences and benefits of various manufacturing processes.  To the extent Sig Sauer disagrees with Hicks's opinion, it has its own experts to present that disagreement and can cross-examine Hicks about the bases for his opinion.  In sum, Sig Sauer's challenges to the reliability of Hicks's opinion are directed more to the sufficiency or weight of Hicks's opinion than to its threshold reliability.

III.    Sig Sauer has not demonstrated that it is entitled to summary judgment in its favor.

Sig Sauer moves for summary judgment on the premise that Guay cannot prevail on his products liability claims if the court excludes Villani's and Hicks's opinions.  Sig Sauer also moves for summary judgment on the ground that Guay cannot prove causation because Guay's experts merely state that the gun was capable of firing without a trigger pull, not that it actually did so in this case.  In essence, Sig Sauer faults Guay's experts for being less than 100 percent certain about what occurred in this case.

Summary judgment is proper only if the moving party can demonstrate "that there is no evidence in the record to support a judgment for the nonmoving party." Celotex Corp. v. Catrett, 477 U.S. 318, 332 (1986); see also Fed. R. Civ. P. 56(a).  In evaluating a motion for summary judgment, the court must view the evidence in the light most favorable to the nonmoving party, must draw all reasonable inferences in that party's favor, and may neither make credibility determinations nor weigh the evidence.  Harris v. Scarcelli, 835 F.3d 24, 29 (1st Cir. 2016); Hicks v. Johnson, 755 F.3d 738, 743 (1st Cir. 2014).

First, because the court has denied the motions to exclude Guay's expert witnesses, Sig Sauer's motion for summary judgment on the ground that Guay cannot prove his case without expert witnesses is denied.  Second, taking the evidence in the light most favorable to Guay, there is sufficient evidence in the record for a reasonable jury to conclude, by a preponderance of the evidence, that Guay did not pull the P320's trigger and that the gun discharged because of the

19

design or manufacturing defects identified by Villani and Hicks. Sig Sauer's desire for absolute certainty is misplaced because the standard of proof in this case is preponderance of the evidence.

Sig Sauer's motion for summary judgment (doc. no. 28) is denied.

SO ORDERED.

_____
Landya McCafferty
United States District Judge

July 11, 2022

cc:    Counsel of Record